**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x

In re:                                                                    Case No. 09-15479 (SHL)

MADISON BENTLEY ASSOCIATES, LLC,                    Chapter 7

                              Debtor.
----------------------------------------------------------------x
GREGORY MESSER, as Chapter 7 Trustee,

                              Plaintiff,

            v.                                                            Adv. No. 10-03487 (SHL)

BENTLEY MANHATTAN INC.,
MANHATTAN MOTORCARS INC., and
BRIAN MILLER,

                              Defendants.
----------------------------------------------------------------x

<u>**MEMORANDUM OF DECISION**</u>

A P P E A R A N C E S :

**KUCKER & BRUH, LLP**
*Attorneys for the Plaintiff*
747 Third Avenue
New York, New York 10017
By:     Abner T. Zelman, Esq.

**REISMAN PEIREZ REISMAN & CAPOBIANCO, LLP**
*Attorneys for Defendants*
1305 Franklin Avenue
P.O. Box 119
Garden City, New York 11530
By:     Jerome Reisman, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are cross-motions for summary judgment filed by plaintiff Gregory Messer as Chapter 7 trustee (the "Plaintiff" or the "Trustee") for the debtor Madison Bentley Associates, LLC (the "Debtor") and by defendants Bentley Manhattan Inc. ("Bentley Manhattan"), Manhattan Motorcars Inc. ("Manhattan Motorcars"), and Brian Miller ("Miller") (collectively, the "Defendants").  ECF Nos. 35, 26.

The Trustee's complaint alleges that the Debtor entered into a ten year lease for premises at 437 Madison Avenue, New York, New York (the "Premises") and then allowed the leased Premises to be used by the Defendants for no consideration.  *See* Complaint ("Compl.") ¶¶ 11–12, 20–22 (ECF No. 1).  The Trustee further alleges that Defendant Miller owns and controls both of the corporate Defendants, Bentley Manhattan and Manhattan Motorcars.  *See id.* ¶ 22.  In its complaint, the Trustee's first count alleges that Miller exercised his domination and control of the Debtor, Bentley Manhattan, and Manhattan Motorcars to utilize the Debtor's corporate assets for the benefit of Bentley Manhattan and Manhattan Motorcars and therefore, the two corporate Defendants are alter egos of the Debtor and their property is vested with the Debtor's estate under Sections 541 and 542(a) of the Bankruptcy Code.  Compl. ¶¶ 24–25.  The Trustee's second count alleges that the Debtor transferred its lease to the Defendants without fair consideration when the Debtor was insolvent and the Debtor is entitled to that value under Section 544(b)(1).  Compl. ¶¶ 27–28.

For the reasons set forth below, the Court denies summary judgment to all parties on Count One because of disputed issues of fact.  As to Count Two, the Court concludes that the Trustee has established liability but there are open issues regarding the amount of damages.

2

## BACKGROUND

Defendant Miller formed the Debtor on March 21, 2000.  Plaintiff's Statement of

Undisputed Facts ("Tr. Stmnt.") ¶ 20 (ECF No. 35-2); Defendants' Response to Plaintiff's

Statement of Undisputed Facts ("Def. Resp.") ¶ 20 (ECF No. 44).[1]  Miller owns ninety percent

of the equity of the Debtor, with his father owning the remaining ten percent.  Tr. Stmnt. ¶ 26;

Def. Resp. ¶ 26.  Defendant Bentley Manhattan was incorporated on April 20, 2000, with Miller

as the sole owner.  Tr. Stmnt. ¶¶ 29–30; Def. Resp. ¶¶ 29–30.  Miller is also the sole owner of

Defendant Manhattan Motorcars, which commenced business in 1995.  Tr. Stmnt. ¶¶ 48, 50;

Def. Resp. ¶¶ 48, 50.  Miller made all business decisions and conducted all business transactions

for the Debtor, Bentley Manhattan, and Manhattan Motorcars.  Tr. Stmnt. ¶ 60; Def. Resp. ¶ 60.

Many aspects of these entities were intertwined.  On federal income tax returns, Bentley

Manhattan listed its address as 270 Eleventh Avenue, New York, New York, which is also the

address of Manhattan Motorcars' car dealership.  Tr. Stmnt. ¶ 70; Def. Resp. ¶ 70.  Bentley

Manhattan designated its address as Bentley Manhattan, Inc. care of Manhattan Motorcars, Inc.

270 Eleventh Avenue, for mailing of process to it by the New York State Department of State.

Tr. Stmnt. ¶ 47; Def. Resp. ¶ 47.  Book keeping functions for Bentley Manhattan were performed

---

[1]    Except where otherwise noted, the facts set forth are undisputed.  In response to the Defendants' Statement of Undisputed Facts, the Trustee submitted a Counterstatement pursuant to Local Rule 7056-1.  Local Rule 7056-1(d) provides that each numbered paragraph in a statement of material facts shall be deemed admitted for the purposes of the motion unless specifically controverted in the opposing party's responsive statement.  For many of the numbered paragraphs, the Trustee responded that the Defendants' statement was irrelevant and immaterial, but did not actually dispute the fact.  The Trustee's response to many of these paragraphs is puzzling given that the facts in question are discussed in the Trustee's own pleadings or pertain to documents attached to the Trustee's moving papers.  *See* Trustee's Counterstatement of Undisputed Material Facts ("Tr. Resp.") ¶ 20 (ECF No. 47) (claiming assignment of the lease was irrelevant and immaterial); *but see* Ex. H to Trustee's Mot. (ECF No. 35-11) (attaching assignment).  For the purposes of summary judgment, the Court has treated as undisputed facts those instances where the Trustee did not identify the fact as disputed, even if the Trustee characterized it as irrelevant or immaterial.

3

by a Manhattan Motorcars employee.  Tr. Stmnt. ¶ 57; Def. Resp. ¶ 57.  Manhattan Motorcars'

federal income tax returns from 2000 to 2003 listed its address as Miller's office in Mount

Vernon, New York.  Tr. Stmnt. ¶ 72; Def. Resp. ¶ 72.  Although the Debtor, Bentley Manhattan,

and Manhattan Motorcars each maintained separate bank accounts at the same Chase bank

branch, they all employed the same accountant.  Tr. Stmnt. ¶¶ 61, 64; Def. Resp. ¶¶ 61, 64.  The

Debtor's bank statements were sent to Miller's office in Mount Vernon, New York.  Tr. Stmnt. ¶

63; Def. Resp. ¶ 63.  All three entities were insured through the same agency.  Tr. Stmnt. ¶ 62;

Def. Resp. ¶ 62.

The lease at issue was executed on March 29, 2000, by non-party MMC Madison LLC

("MMC") for commercial space located at the Premises for a term of ten years (the "Lease").

Defendants' Statement of Undisputed Facts ("Def. Stmnt.") ¶ 1 (ECF No. 30); Tr. Resp. ¶ 1

(ECF No. 47); *see* Lease attached as Exh. G to Plaintiff's Motion for Summary Judgment ("Tr.

Mot.") (ECF No. 35-10).  Miller signed the Lease as MMC's "Managing Member."  Tr. Stmnt. ¶

17; Def. Resp. ¶ 17; Lease at 5.  The Premises was leased from Madison Avenue Leasehold,

LLC (the "Owner"), through the Owner's agent Sage Realty Corporation ("Sage").

Simultaneously with the execution of the Lease, Miller and his father Arthur Miller (together, the

"Millers"), executed a guaranty for the first three years of the Lease term.  Def. Stmnt. ¶ 16; Tr.

Resp. ¶ 16.  The Lease term began on June 15, 2000, when the Owner completed construction

and MMC took possession of the Premises.  Def. Stmnt. ¶¶ 4, 19; Tr. Resp. ¶¶ 4, 19.

The Lease states, "Tenant shall use and occupy demised premises for automobile

showroom for Rolls-Royce and Bentley motor cars and executive offices in connection

therewith." Lease at 1. The Lease contains restrictions regarding who may use the Premises. It

provides in relevant part:

> Tenant . . . expressly covenants that it shall not assign, mortgage or
> encumber this agreement, nor underlet, or suffer or permit the
> demised premises or any part thereof to be used by others, without
> the prior written consent of Owner in each instance. If this lease be
> assigned, or if the demised premises or any part thereof be underlet
> or occupied by anybody other than Tenant, Owner may, after default
> by Tenant, collect rent from the assignee, under-tenant or occupant,
> and apply the net amount collected to the rent herein reserved . . . .

Lease at 2. In the margin next to this section of the Lease, there is a typewritten note "[s]ee

Article 46." *Id.* Article 46 of the Lease provides that the Tenant may, upon ten days' written

notice to the Owner, permit a "Related Entity" to use the Premises under certain circumstances.

Such Related Entity may:

> occupy the Demised Premises solely for the purposes permitted to
> Tenant, subject however to compliance with Tenant's obligations
> under this Lease and subject further to the condition that such
> Related Entity shall continue to operate its business in the same
> manner as operated by Tenant. Such subletting or occupancy shall
> not be deemed to vest in any such Related Entity any right or interest
> in this Lease nor shall such subletting or occupancy relieve, release,
> impair or discharge any of Tenant's obligations hereunder. Tenant
> shall deliver to Owner a copy of any such sublease or occupancy
> agreement if any for all or any portion of the Demised Premises.

Lease at 21–22, Article 46(b). The Lease defines a Related Entity as "any corporation or other

business entities which control, are controlled by, or are under common control with Tenant."

*Id.*

On July 18, 2000, MMC assigned the Lease to the Debtor, then a newly-formed entity.

Def. Stmnt. ¶ 20; *see also* MMC Assignment attached as Exh. H to Tr. Mot. (ECF No. 35-11).

Miller signed the assignment instrument on behalf of both MMC and the Debtor. Tr. Stmnt. ¶

5

19; Def. Resp. ¶ 19.  As required by the Lease, the Owner consented to the assignment to the

Debtor.  Def. Stmnt. ¶ 20; Tr. Resp. ¶ 20.  At the time of the assignment, Miller and his father

reaffirmed their three-year guaranty.  Def. Stmnt. ¶ 24; Tr. Resp. ¶ 24.  The Debtor's sole asset

was the Lease.  Tr. Stmnt. ¶ 15; Def. Resp. ¶ 15.  Miller characterized the Debtor as a "dummy

corporation."  Tr. Stmnt. ¶ 25; Def. Resp. ¶ 25; *see also* Def. Stmnt. ¶ 22.  Robert Kaufman, a

principal officer of both Sage and the Owner, testified that Miller never concealed the nature of

his business relationship with the Debtor from the Owner or Sage.  *See* Deposition of Robert

Kaufman, dated June 21, 2011 ("Kaufman Dep."), attached as Exh. A to Declaration of Marc

Sackin ("Sackin Decl."), at 123:7–12 (ECF No. 28-1).  The Owner was aware that MMC and the

Debtor were newly formed entities.  Kaufman Dep. at 57:5–21; *see also* Deposition of Michael

Lenchner, dated March 16, 2011 ("Lenchner Dep."), attached as Exh. B to Sackin Decl., at

56:22–23 (ECF No. 28-2).  The Owner also knew that both MMC and the Debtor were limited

liability companies.  *See* Plaintiff's Interrogatory Responses, Response No. 5, attached as Exh. C

to Sackin Decl. (ECF No. 28-3).  The Owner further knew that the Debtor and MMC did not

have any assets aside from the Lease.  Kaufman Dep. at 57:5–6.  In light of the Millers'

guaranty, the Owner did not perform any financial check on MMC or the Debtor.  Lenchner Dep.

at 64:5–18; 97:6–18.

    During the Debtor's occupancy, Bentley Manhattan and Manhattan Motorcars both

operated in some capacity at the Premises.  The parties agree on some of the basic facts

regarding the activities of these two Defendant entities on the Premises.  Bentley Manhattan

maintained an office at the Premises, from which it sold boutique accessories including Bentley

T-shirts, hats, and key chains.  Tr. Stmnt. ¶¶ 32, 42, 58; Def. Resp. ¶¶ 32, 42, 58.  Three Bentley

Manhattan employees worked out of the office at the Premises.  Tr. Stmnt. ¶ 36; Def. Resp. ¶ 36.

Bentley Manhattan paid most of the monthly rent checks to the Owner during the Debtor's

occupancy.  Def. Stmnt. ¶ 40; Tr. Resp. ¶ 40; *see* Rent Checks attached as Exh. K to Brian

Miller's Affidavit ("Miller Aff.") (ECF No. 26-11).  Manhattan Motorcars owned the

automobiles on display at the Premises.  Tr. Stmnt. ¶ 40; Def. Resp. ¶ 40.  Manhattan Motorcars

was also the named entity on the franchise agreements from Bentley Motors, Inc., the

international automobile manufacturer.  Tr. Stmnt. ¶¶ 52–53; Def. Resp. ¶¶ 52–53; *see* 2000

Franchise Agreement attached as Exh. X to Tr. Mot. (ECF No. 35-27); 2006 Franchise

Agreement attached as Exh. Y to Tr. Mot. (ECF No. 35-28).  Pursuant to another agreement

dated May 8, 2000, Bentley Motors, Inc. agreed to subsidize Manhattan Motorcars' rent

payments if it entered into a showroom lease for at least a three-year term.  Tr. Stmnt. ¶ 53; Def.

Resp. ¶ 53; *see* May 2000 Agreement attached as Exh. W to Tr. Mot. (ECF No. 35-26).

Manhattan Motorcars, a car dealership, operated a showroom and office at 270 Eleventh Avenue,

New York, New York.  Tr. Stmnt. ¶ 49; Def. Resp. ¶ 49.  Manhattan Motorcars' federal income

tax returns indicate income from the sale of cars.  Tr. Stmnt. ¶ 72; Def. Resp. ¶ 72.

        Beyond these facts, the parties' views diverge about the activities on the Premises.  For

example, the parties dispute whether any actual automobile sales were conducted at the

Premises.  The Trustee contends that Bentley Manhattan operated a car dealership at the

Premises, selling the cars acquired by Manhattan Motorcars, the franchise holder.  Tr. Mot. at ¶¶

9–10.  The Defendants contend that Bentley Manhattan did not complete any sales, but rather

used the Premises as a showroom and boutique to sell accessories with any automobile sales

conducted by Manhattan Motorcars at its dealership located at 270 Eleventh Avenue.

Defendants' Opposition to Plaintiff's Motion for Summary Judgment ("Defs. Opp.") at 23–24 (ECF No. 41). The parties further disagree whether the Debtor subleased the Premises to the Defendants. The Trustee points to the Debtor's federal income tax returns and a DMV application, both of which indicate that the Debtor was in the business of sublease rental. Tr. Stmnt. ¶ 27; *see* Debtor's 2001-2003 Tax Returns attached as Exhs. I, J, K to Tr. Mot. (ECF Nos. 35-12, 35-13, 35-14); DMV Ownership Statement attached as Exh. O to Tr. Mot. (ECF No. 35-18). The Defendants disagree. They claim the tax returns are in error, which they attribute to the Debtor's former accountant. Def. Resp. ¶ 27; Rule 2004 Deposition of Miller, dated February 9, 2010 ("Miller Dep."), attached as Exh. C to Compl., at 17:4–6 (ECF No. 1-3).

The parties also offer contrasting views about the parties' understanding prior to entering the Lease. They disagree about whether the Owner and Sage knew that both MMC and the Debtor were assetless corporations formed solely so that Miller could avoid personal liability on the Lease. Specifically, the parties' dispute whether prior to entering into the Lease, the Owner and Sage were aware that the Lease could only be accomplished through a "dummy corporation," Def. Stmnt. ¶ 5; Tr. Resp. ¶ 5, or whether it was disclosed that MMC's sole business purpose was to enter into the Lease. Def. Stmnt. ¶ 6; Tr. Resp. ¶ 6. It is further disputed whether the Owner was aware prior to consenting to the assignment of the Lease that the Debtor had no intent to do business and that its sole business purpose was to enter into the Lease. Def. Stmnt. ¶ 21; Tr. Resp. ¶ 21. Turning specifically to Bentley Manhattan's activities, it is disputed whether prior to entering into the Lease, the Owner and Sage were informed that Bentley Manhattan would share occupancy and maintain offices at the Premises. Def. Stmnt. ¶¶ 33–34; Tr. Resp. ¶¶ 33–34.

8

The Debtor vacated the Premises on September 29, 2003, just after the expiration of the Millers' three-year guaranty. Tr. Stmnt. ¶ 8; Def. Resp. ¶ 8. The Owner subsequently commenced an action in New York State Supreme Court against the Debtor, Miller, and Miller's father seeking damages for unpaid rent for the remainder of the Lease term (the "State Court Action"). Def. Stmnt. ¶ 46; Tr. Resp. ¶ 46. The Owner did not name Bentley Manhattan or Manhattan Motorcars as defendants in the State Court Action. Def. Stmnt. ¶ 48; Tr. Resp. ¶ 48. On January 4, 2005, the state court granted the Millers' motion for summary judgment dismissing the Owner's complaint against them. Def. Stmnt. ¶ 49; Tr. Resp. ¶ 49. The state court concluded that the Millers were not personally liable under the Lease for the default because they had only guaranteed payment for the first three years of the Lease. Def. Stmnt. ¶ 50; Tr. Resp. ¶ 50. The Appellate Division, First Department and the New York Court of Appeals both affirmed the trial court's decision granting summary judgment in favor of the Millers. Def. Stmnt. ¶¶ 51–52; Tr. Resp. ¶¶ 51–52. The Owner subsequently obtained a judgment against the Debtor only. Tr. Stmnt. ¶ 10; Def. Resp. ¶ 10. The judgment was entered in the amount of $1,274,125.16 on June 24, 2009. *Id.*

The Debtor filed a Chapter 7 bankruptcy petition on September 11, 2009, listing the Owner as its sole creditor. *See* Petition (Lead Case ECF No. 1). The Trustee subsequently filed this adversary proceeding against the non-debtor third parties Miller, Bentley Manhattan, and Manhattan Motorcars, alleging claims for alter ego liability (Count I), constructive fraud (Count II), and actual fraud (Count III). *See* Compl. The Defendants filed a motion to withdraw the reference, which was denied by the United States District Court for the Southern District of New York on June 26, 2012. *See In re Madison Bentley Assocs., LLC*, 474 B.R. 430 (S.D.N.Y. 2012).

9

In its decision, the District Court concluded that this Court lacked constitutional authority to enter a final judgment on these claims but instead could continue proceedings and submit a report and recommendation. *Id.* at 438–40 (citing *In re Orion Pictures Corp.*, 4 F.3d 1095 (2d Cir. 1993)).

This Court subsequently issued a report and recommendation on the parties' cross-motions for summary judgment, recommending that a final judgment be entered dismissing the alter ego claim for lack of standing and dismissing the two fraudulent conveyance claims on statute of limitations grounds. The parties filed their objections. In its decision, the District Court concluded that the Trustee had standing to assert an alter ego claim on behalf of the Debtor's estate. The District Court dismissed the fraudulent conveyance claim in Count III on statute of limitations grounds. Finally, the District Court concluded that the fraudulent conveyance claim in Count II should be dismissed on statute of limitations grounds for all but the 19 day period from September 11, 2003 to September 29, 2003. *In re Madison Bentley Assocs., LLC*, 516 B.R. 724, 730, 732–33 (S.D.N.Y. 2014). The District Court found that the conveyance took place on an ongoing basis, each and every day the Defendants used the Premises. *Id.* at 730. Thus, the District Court concluded the fraudulent conveyance claims were not barred, to the extent they accrued after September 11, 2003, as the statute of limitations was tolled upon the filing of the bankruptcy petition. *Id.*

After remand, the parties requested that this Court address the remaining arguments in their already filed cross-motions for summary judgment. These arguments include the merits of the Plaintiff's alter ego claim and the remaining fraudulent conveyance claim. The Defendants contest the merits of the Plaintiff's claims for a variety of reasons. The Defendants contend,

10

among other things, that the Plaintiff's alter ego claim must fail because the Owner knew at the

time it entered into the Lease that MMC Madison LLC was a no-asset limited liability company

formed solely to avoid personal liability and that the Owner also knew the Debtor was a no-asset

limited liability company formed solely to avoid personal liability when it consented to the

assignment of the Lease to the Debtor.  The Defendants also argue that all of the Plaintiff's

claims are barred by the doctrine of *res judicata* given prior proceedings in the state court.

## DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a) (made

applicable to the adversary proceeding by Fed. R. Bankr. P. 7056).  The moving party bears the

burden of demonstrating the absence of any genuine issue of material fact, and all inferences to

be drawn from the underlying facts must be viewed in the light most favorable to the party

opposing the motion.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Ames

Dep't Stores, Inc. v. Wertheim Schroder & Co., Inc.* (*In re Ames Dep't Stores, Inc.*), 161 B.R. 87,

89 (Bankr. S.D.N.Y. 1993).  Once the moving party meets this initial burden, the non-moving

party must go beyond the pleadings and, by its own evidence, demonstrate that there is a genuine

issue of fact for trial.  *See Celotex*, 477 U.S. at 323.  If the non-moving party fails to make such a

showing, then the moving party is "entitled to a judgment as a matter of law."  *Id.* at 322; Fed. R.

Civ. P. 56(e).

11

## I.      Plaintiff's Claims are Not Barred by the Doctrine of *Res Judicata*

The Defendants argue that all of the Plaintiff's claims are barred by the doctrine of *res judicata*.  "Under the doctrine of res judicata, or claim preclusion, '[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'"  *St. Pierre v. Dyer*, 208 F.3d 394, 399 (2d Cir. 2000) (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981)).  *Res judicata* applies where an earlier decision was "(1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action."  *EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621, 624 (2d Cir. 2007) (citation omitted).  New York employs a "transactional approach" to *res judicata*, meaning "once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy."  *Hameed v. Aldana*, 296 F. App'x 154, 155 (2d Cir. 2008) (quoting *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357 (1981)).  To determine whether a claim that was not raised in the previous action could have been raised, courts consider "whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first."  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 287 (2d Cir. 2002) (quoting *Woods v. Dunlop Tire Corp.*, 972 F.2d 36, 38 (2d Cir. 1992)).  The fact that two suits "involved essentially the same course of wrongful conduct is not decisive."  *Marvel*, 310 F.3d at 287 (quoting *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 327 (1955)).  Rather, to determine whether two actions arise from the same transaction courts consider "whether the underlying facts are related in time,

space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 90 (2d Cir. 1997) (citations and internal quotations omitted).

As a threshold matter, the Defendants' argument based on *res judicata* is not timely raised. "Res judicata is an affirmative defense, Fed. R. Civ. P. 8(c), and as such is waived if not affirmatively pleaded in the answer." *Allen v. Men's World Outlet, Inc.*, 679 F. Supp. 360, 365 (S.D.N.Y. 1988). An exception exists where the defense is not available at the pleading stage because the prior action has not finished. *See Morrison v. Blitz*, 1995 WL 679259, at *3 (S.D.N.Y. Nov. 15, 1995). Here, the state court action had concluded before the Debtor filed for bankruptcy, yet the Defendants did not raise the *res judicata* defense in their answer. Defendants' Answer (ECF No. 6). Therefore, the Defendants have waived the right to assert the defense. *See Allen*, 679 F. Supp. at 365 (citing *Evans v. Syracuse City school District*, 704 F.2d 44, 47–48 (2d Cir. 1983)).

In any event, the Defendants do not meet the requisite elements for *res judicata.* As to the first and second requirements, the prior state court decision at issue was a final judgment on the merits by a court of competent jurisdiction. The Plaintiff does not dispute these two elements. Turning to the third requirement, the actions do not involve the same parties, as this adversary proceeding is filed by the Trustee, rather than the Owner. However, the Defendants argue this requirement is met because the Trustee is in privity with the Owner from the previous state court action.[2] To establish privity under New York law, "the connection between the

---

[2]    The Plaintiff has not addressed in either its papers or oral argument whether privity exists between the Owner from the previous state court action and the Trustee in the present action. *See* Defendants' Motion for

parties must be such that the interests of the nonparty can be said to have been represented at the

prior proceeding." *Hellman v. Hoenig*, 989 F. Supp. 532, 536 (S.D.N.Y. 1998) (citations and

internal quotations omitted).  Privity between parties may exist when "there is substantial

identity of the incentives of the earlier party with those of the party against whom *res judicata* is

asserted[.]" *In re Worldcom*, 401 B.R. 637, 649 (Bankr. S.D.N.Y. 2009) (internal citations and

quotations omitted).  However, "[d]oubts should be resolved against imposing preclusion to

ensure that the party to be bound can be considered to have had a full and fair opportunity to

litigate." *Buechel v. Bain*, 97 N.Y.2d 295, 305 (2001).

        The previous state court action was brought by the Owner against the Debtor and the

Millers to recover damages for an alleged breach of a commercial lease agreement between the

Owner and the Debtor.  *Madison Ave. Leasehold LLC v. Madison Bentley Assocs. LLC,* 2005

N.Y. Misc. LEXIS 8505 (Sup. Ct. N.Y. Cnty. Jan. 4, 2005).  As a result of the state court action,

the Owner became a judgment creditor of the Debtor.  Tr. Stmnt. ¶ 10; Def. Resp. ¶ 10.  In

contrast, the Trustee asserts its alter ego action here as a way to reach additional assets for

distribution to all creditors—an interest that was not represented in the prior state court action.

*In re Madison Bentley*, 516 B.R. at 728 (finding Trustee had standing to assert veil piercing

claim because the action was brought seeking "a declaration as to whether property of one of the

defendants in fact was property of the estate" and thus, "the claim belongs to the estate").  Nor is

there a "substantial identity" between the incentives of the Owner in the first action and the

Trustee in the current action.  The previous action took place before the Debtor filed for

---

Summary Judgment or Stay ("Defs. Mot.") at 49 (ECF No. 29); Hearing Transcript ("Hr'g Tr."), October 3, 2012 at
42:8-25; 43:1-13 (ECF No. 62).  In any event, the Court finds that the requirement of identity of the parties has not
been satisfied for the reasons stated above.

bankruptcy; thus, there was no estate. *See In re Worldcom, Inc.*, 401 B.R. at 650–51 (finding no

privity between Chapter 7 trustee for OneStar and OneStar where incentives of parties were not

identical and trustee was not a successor-in-interest for the purposes of pursuing avoidance

actions). Yet, the Defendants argue that the Trustee and the Owner share identical incentives,

pointing to the fact that the same attorney represents the Trustee as represented the Owner in the

previous action and that the Owner is the Debtor's sole creditor. Defs. Mot. at 51. But these

facts are not dispositive. Furthermore, it is irrelevant to the *res judicata* analysis that the Debtor

has only one creditor because the Trustee acts on behalf of the estate. *See In re Madison Bentley*,

516 B.R. at 729.

      Finally, the Court finds that the fourth requirement for imposing *res judicata* is not met.

The issue in the state court action was whether the Debtor had defaulted during the first three

years of its lease, such that the Millers, as personal guarantors, could be held personally liable for

the alleged default. *Madison Ave. Leasehold*, 2005 N.Y. Misc. LEXIS, at *3. In the current

action, the Trustee seeks a declaration that the Defendants are alter egos of the Debtor, and thus,

the property of the Defendants may properly be construed as property of the estate. Compl. ¶ 1.

The alter ego claim requires the Court to evaluate the relationship between the Defendants, an

issue not raised by the state court case. Thus, the "evidence [that] is needed to support both

claims" is quite different. *Marvel Characters*, 310 F.3d at 287 (citation omitted). Furthermore,

"[f]or a claim to be barred based on the fact that it *could* have been brought in a prior action, the

claim logically must have arisen before the prior action." *Am. Federated Title Corp. v. GFI*

*Mgmt*, 39 F. Supp. 3d 516, 524 (S.D.N.Y. 2014) (finding element of *res judicata* requiring

identity of causes of action not met where plaintiff stated it was "unaware that the judgment

debtors had insufficient assets to pay the bankruptcy settlement until after judgment was entered"). Here, the Trustee has asserted that the facts relating to the present claims were not known at the time of the previous state court action. Hr'g Tr. at 42:16-25.

For the reasons discussed above, therefore, the Court concludes that the elements of *res judicata* have not been established.

## II.   Plaintiff's Alter Ego Claim in Count I

### A.   The Merits

Under New York law, the theories for alter ego and piercing the corporate veil are evaluated together. *See In re JMK Constr. Group, Ltd.*, 502 B.R. 396, 405 (Bankr. S.D.N.Y. 2013) (citing *Gosconcert v. Hillyer*, 158 B.R. 24, 28 (S.D.N.Y. 1993) (observing that alter ego liability is one basis for piercing the corporate veil)). The doctrine of piercing the corporate veil

> is a limitation on the accepted principles that a corporation exists independently of its owners, as a separate legal entity, that the owners are normally not liable for the debts of the corporation, and that it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners.

*Morris v. New York State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 140 (1993) (citations omitted). This doctrine "is typically employed by a third party seeking to go behind the corporate existence in order to circumvent the limited liability of the owners and to hold them liable for some underlying corporate obligation." *Morris*, 82 N.Y.2d at 140–41 (citations omitted). Thus, the doctrine permits disregarding the corporate form when it has been abused or "there exists such an identity or unity between the entities that it becomes necessary to ignore the legal distinctions between them to prevent an unjust result." *In re Cabrini Med. Ctr.*, 2012 WL 2254386, at *7 (Bankr. S.D.N.Y. June 15, 2012) (citing *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1344 (7th Cir. 1987)).

16

Under New York law, piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation with respect to the transaction; and (2) such domination was used to commit a fraud or wrong against the plaintiff which resulted in injury to the plaintiff. *Morris*, 82 N.Y.2d at 141; *Babitt v. Vebeliunas* (*In re Vebeliunas*), 332 F.3d 85, 87–88 (2d Cir. 2003); *Fin. One, Inc. v. Timeless Apparel, Inc.*, 2011 WL 1345030, at *4 (S.D.N.Y. Mar. 29, 2011).  While complete domination of the corporation is key to piercing the corporate veil, such domination standing alone is not enough; "some showing of a wrongful or unjust act toward plaintiff is required." *Morris*, 82 N.Y.2d at 141–42 (citations omitted).[3]

Whether to pierce the corporate veil cannot always necessarily be determined by a definitive test, due to the "attendant facts and equities" in any particular case. *Id.* at 141.  Indeed, equitable concerns are of the utmost importance in such a determination. *See id.* (recognizing the concept of piercing the corporate veil is "equitable in nature"); *Sec. Inv'r Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 322 (Bankr. S.D.N.Y. 1999) ("As is always the case with equity, decisions to pierce the corporate veil should be made according to the circumstances of each particular case.").  Thus, courts will disregard the corporate form and pierce the corporate veil "whenever necessary to prevent fraud or to achieve equity." *Walkovszky v. Carlton*, 18 N.Y.2d 414, 417 (1966) (internal quotations and citations omitted).

As to the first prong of the test, New York courts consider the following factors when determining whether the requisite domination of the corporation existed:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2)

---

[3]    As the Trustee has standing as the Plaintiff to bring claims on behalf of the Debtor, it must show that the Defendants' actions caused injury to the Debtor in order to satisfy this prong. *See generally In re Madison Bentley Assocs., LLC*, 516 B.R. 724 (S.D.N.Y. 2014).

> inadequate capitalization, (3) whether funds are put in and taken
> out of the corporation for personal rather than corporate purposes,
> (4) overlap in ownership, officers, directors, and personnel, (5)
> common office space, address and telephone numbers of corporate
> entities, (6) the amount of business discretion displayed by the
> allegedly dominated corporation, (7) whether the related
> corporations deal with the dominated corporation at arms length
> [sic], (8) whether the corporations are treated as independent profit
> centers, (9) the payment or guarantee of debts of the dominated
> corporation by other corporations in the group, and (10) whether
> the corporation in question had property that was used by other of
> the corporations as if it were its own.

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S. Inc.*, 933 F.2d 131, 139 (2d Cir. 1991).

Under New York law, courts may disregard the corporate form to achieve an equitable result "when a corporation has been so dominated by an individual or another corporation and its separate entity so ignored that *it primarily transacts the dominator's business instead of its own* and can be called the other's alter ego . . . ." *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs.*, 386 F. Supp. 2d 461, 471 (S.D.N.Y. 2005) (quoting *Austin Powder Co. v. McCullough*, 628 N.Y.S.2d 855, 857 (App. Div. 3d Dep't 1995)) (emphasis added). Where it is clear that a party is conducting business to suit its own ends, and does so by shuttling its own funds in and out without regard to the corporation's form, such activity exceeds the limits of corporate privilege and permits the imposition of liability on individual stockholders. *Wm. Passalacqua Builders,* 933 F.2d at 138. "The critical question is whether the corporation is a shell being used by the individual shareowners to advance their own purely personal rather than corporate ends." *Id.* (internal quotations omitted) (citing *Port Chester Elec. Constr. Corp. v. Atlas*, 40 N.Y.2d 652, 656–57 (1976)).

Applying these legal principles here, the Court concludes that the elements for piercing the corporate veil have been satisfied. To satisfy the first prong, the Plaintiff must show that the

Defendants "exercised complete domination of the corporation in respect to the transaction . . . ."
*Morris*, 82 N.Y.2d at 141.  The Court finds numerous factors here support finding that the
Defendants exercised such domination over the Debtor.  *See Wm. Passalacqua Builders*, 933
F.2d at 139.  For example, it is undisputed that the Debtor was merely a "shell" corporation,
which never conducted any business under its own name.  It had no employees, no customer
lists, and no income of its own.  The Debtor's sole asset was the Lease.  The Debtor was
undercapitalized with its only funds being those advanced to pay rental obligations under the
Lease.  Miller Dep. at 16–18.  In fact, the majority of rental payments the Debtor owed under the
Lease were paid by Bentley Manhattan.  Furthermore, there is clear overlap in ownership
amongst the Defendants.  Miller is the sole owner of Bentley Manhattan and Manhattan
Motorcars, along with owning and controlling the Debtor.  Miller was responsible for making all
business decisions and conducting all business transactions for all of the Defendants.  The
Defendants shared a common office space and address.  Bentley Manhattan maintained offices
and operated a boutique at the Premises.  Manhattan Motorcars owned the automobiles that were
on display at the Premises.  Furthermore, Bentley Manhattan also maintained an office at 270
Eleventh Avenue, the same location which Manhattan Motorcars operated a car dealership with a
showroom and its own office.  And crucially, the Defendants utilized the Premises as if it were
their own property.  Thus, the Defendants dominated the Debtor to accomplish their own
business purposes.  There can be no dispute that the Debtor was used to further the Defendants'
goals of showing and selling automobiles.  Nor is there any dispute that the Debtor received no

benefit for doing so.  The Debtor was simply used as a shell.  In short, the Defendants used the

Debtor for their own ends.[4]

The Court also concludes that the Trustee has satisfied the second prong of the test,

which requires that the domination of the corporation "was used to commit a fraud or wrong

against the plaintiff which resulted in the plaintiff's injury." *Morris*, 82 N.Y.2d at 141.  Here,

the Trustee is standing in the shoes of the Debtor.  *In re Madison Bentley*, 516 B.R. at 728.

Courts have held that the diversion of funds, thereby rendering a corporation judgment-proof,

constitutes a wrong under New York law for the purposes of piercing the corporate veil.  *See JSC*

*Foreign Econ. Ass'n*, 386 F. Supp. 2d at 476; *see also Capital Distribution Servs. v. Ducor*

*Express Airlines*, 2007 U.S. Dist. LEXIS 31943, at *10–11 (E.D.N.Y. May 1, 2007) (finding the

diversion of funds to render a corporation judgment-proof qualified under the New York state

law standard).  Such a wrong also includes a diversion of assets.  *Holborn Oil Trading, Ltd. v.*

*Interpetrol Bermuda, Ltd.*, 774 F. Supp. 840, 847 (S.D.N.Y. 1991) ("[S]tripping of the assets of

the subsidiary by the parent, motivated by a desire to render the subsidiary judgment proof,

would constitute a 'fraud or wrong' justifying piercing of the corporate veil. ") (citing *Carte*

*Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l., Inc.*, 758 F. Supp. 908, 917 (S.D.N.Y.

1991)); *Godwin Realty Assocs. v. CATV Enters.*, 712 N.Y.S.2d 39, 40–41 (App. Div. 1st Dep't

2000) (piercing the corporate veil where defendant corporation was "treated as a shell

---

[4]    The Debtor listed on its federal tax returns for 2001 to 2004 its primary business as the subleasing of real estate.  Tr. Stmnt. ¶ 27; Def. Resp. ¶ 27.  However, it should be noted that the Defendants contend that said tax returns were incorrectly prepared, and that they do not know why they were prepared in such a manner.  *See* Miller Dep. at 16:6–17:6.  The Defendants contend that "Debtor never sublet any realty or entered into any sublease agreement, either written or oral."  Def. Resp. ¶ 27.  But even putting aside such tax returns as somehow disputed, Bentley Manhattan filed a Statement of Ownership and/or Permission to Use Place of Business in support of its Original Facility Application, stating that it subleased the Premises from the Debtor for the full term of the Lease. Tr. Stmnt. ¶ 38; Def. Resp. ¶ 38.

20

corporation by its corporate and individual shareholders" who had stripped defendant of its

assets, "leaving insufficient assets to cover claimed damages").[5]

Similarly, courts in New York have found that use of the corporate form to evade liability

completely constitutes a wrong that would satisfy the second requirement. *See Ventresca Realty*

*Corp.*, 838 N.Y.S.2d 609, 611 (App. Div. 2d Dep't 2007) ("wrong" committed was vacating the

premises and causing the breach of a lease; thus, the court permitted the plaintiff to pierce the

corporate veil); *CC Ming (USA) Ltd. P'ship v. Champagne Video*, 648 N.Y.S.2d 21, 22 (App.

Div. 1st Dep't 1996) (holding it proper to pierce the corporate veil where "corporate form was

being used not to limit a contracted liability, but to evade it").

The Debtor here entered into the Lease, which was its sole asset. The Debtor conducted

no business operations on the Premises, instead permitting the Defendants to utilize the Premises

for their own purposes, without receiving any compensation, and without receiving any

protection should the Defendants choose to stop using the Premises. Thus, the Defendants

diverted the Debtor's asset for their own use. Through this diversion, the Debtor was unable to

comply with its contractual obligations under the Lease. *See c.f. JSC Foreign Econ. Ass'n*, 386

F. Supp. 2d at 475–76 (imposing alter ego liability where defendants diverted company assets,

rendering the company unable to comply with contractual obligations and pay the resulting

arbitration award and judgment against it). The Defendants used the Debtor as a shell

---

[5]      This is consistent with New York Business Corporation Law, which provides in pertinent part: "[t]he
acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to
perform, or other violation of [duties of officer or director of corporation] . . ." is actionable. N.Y. Bus. Corp. Law §
720(a)(1)(B). The purpose of Section 720 is "to furnish a means of redressing the wrongful disposition of corporate
assets by the corporation's officers and directors." *Planned Consumer Mktg., Inc. v. Coats & Clark, Inc.*, 71 N.Y.2d
442, 451 (1988). "[S]ection 720 [of New York Business Corporation Law] is to be *broadly construed* and is to
cover *every form of waste of assets* and violation of corporate duty." *In re Princeton Indus., Inc.*, 39 B.R. 140, 142
(Bankr. S.D.N.Y. 1984) (emphases added) (citing *Rapoport v. Schneider*, 29 N.Y.2d 396, 400 (1972)).

corporation to reap the benefits of the Lease, while making the Debtor judgment-proof for any breach of the Lease. Thus, the wrongs committed by the Defendants by virtue of their domination include using the corporate form to evade liability and stripping the Debtor of its assets, rendering it judgment-proof.

The Defendants argue that if the Court decides to impose alter ego liability, thereby piercing the Debtor's corporate veil, liability should be limited to Bentley Manhattan. Defs. Opp. at 31. To support this argument, the Defendants state that neither Manhattan Motorcars nor Miller, individually, ever occupied the Premises. *Id.* Additionally, the Defendants maintain that Manhattan Motorcars and Bentley Manhattan are separate entities, run as separate businesses. *Id.* But the present case can be analogized to *Wm. Passalacqua Builders*, in which the plaintiff sought to pierce the corporate veil of defendant, Resnick Developers South, Inc. ("Defendant"), alleging Defendant "was a 'shell' corporation, the *alter ego* of other family-owned corporations or its individual stockholders." 933 F.2d at 133. The plaintiff named as defendants corporate entities controlled entirely by members of the Resnick family or by other corporations controlled by the Resnicks. *Id.* The plaintiff asserted that the defendant corporations "were one whole entity—that is [Defendant] was dominated by the other corporations—and that [Defendant] was really the agent of the Resnick family members who used it to pursue their own ends." *Id.* at 139. The Second Circuit considered the following facts: Defendant had no corporate indicia; no employees, except for its officers, many of whom were also officers and employees of other corporate defendants; and held no meetings. *Id.* Additionally, Defendant was "severely undercapitalized" and all its funds came in the form of loans. *Id.* The "lines of corporate control and responsibility among Resnick-controlled entities were often blurred[,]" as the entities shared

a common office in New York City and had essentially the same officers and directors. *Id.* at

140. The corporations did not deal at arm's length with each other, nor were they treated as

"individual profit centers." *Id.* Rather, funds were "shuffled" from one corporate entity to

another with no demonstrated business purpose. *Id.* Thus, the Second Circuit held that a jury

could find a substantial level of control, which would justify piercing the corporate veil "to reach

the assets of *either* the individual Resnick family members or the other Resnick-controlled

corporate entities." *Id.* (emphasis added).

Similarly, the Debtor was treated as the agent of Miller and the Defendants, which are all

owned by Miller. The Debtor had no employees, no customers, and in fact conducted no

business at all. It was severely undercapitalized, in that it had one asset, the Lease, which was

subsequently utilized by the Defendants. The only funds the Debtor had were those it received

from the Defendants so that it could satisfy its rental obligations under the Lease. The lines of

corporate control were "blurry," as the overlap between all of the Defendants' business activities

and the Debtor was substantial. For instance, while neither the Debtor nor Bentley Manhattan

had a franchise agreement, Bentley Manhattan received governmental approval to become a

registered car dealer at the Premises on December 21, 2000. *See* DMV Approval Letter, attached

as Exh. P to Tr. Mot. (ECF No. 35-19). Yet, it was Manhattan Motorcars that possessed a

franchise agreement with the automaker Bentley. Bentley Manhattan maintained an office at

both the Premises and a property owned by Manhattan Motorcars. Tr. Stmnt. ¶¶ 32, 45; Def.

Resp. ¶¶ 32; 45. Additionally, Bentley Manhattan designated its address for service of process

as "Bentley Manhattan, Inc. care of Manhattan Motorcars at 270 Eleventh Avenue." Tr. Stmnt. ¶

47; Def. Resp. ¶ 47. As for Miller, he made all of the business decisions for all three entities.

23

Additionally, Miller received the Debtor's bank account statements at his Mount Vernon, New York office, the same location listed on Manhattan Motorcars' federal tax returns for the period of time Bentley Manhattan occupied the Premises. The majority of the Debtor's obligations— the rental payments on the Lease—were paid by Bentley Manhattan. Given the overlap of all these Defendants as part of Miller's enterprise to sell cars from the showroom on the Premises, the evidence supports piercing the corporate veil to reach the assets of all the Defendants.[6] But given the Court's conclusions below on the *Brunswick* defense, the Court need not reach a final conclusion as to the scope of alter ego liability. *See infra* Section II.B. Moreover, it should be noted that while both parties discuss the application of alter ego liability to all the Defendants— which necessarily includes Miller—neither party addresses the fact that the Complaint seeks only to declare Bentley Manhattan and Manhattan Motorcars alter egos of the Debtor. *See* Compl. ¶¶ 1, 24.

### B. The Brunswick Defense

Notwithstanding satisfying the elements for piercing the corporate veil, summary judgment is not appropriate for the Plaintiff because there are disputed issues of relevant fact regarding the Defendants' defense under *Brunswick Corp. v. Waxman,* 599 F.2d 34 (2d Cir. 1979), and its progeny. In *Brunswick,* the Second Circuit found the plaintiff had "knowingly entered into the conditional sales contracts . . . with a no-asset corporation which was created for the sole purpose of taking title to the equipment which [plaintiff] sold." *Id.* at 36. Thus, plaintiff "should be charged with the knowledge that [defendants] wished to avoid personal liability and

---

[6]    The Defendants make some factual allegations to support its contention that the Debtor and the Defendant entities were operated as separate businesses. For example, the Defendants assert the entities were incorporated at different times, maintained separate bank accounts, and filed separate tax returns. *See* Defs. Opp. at 31–32.

that the sole obligor on the sales contract was to be the corporate dummy . . . ." *Id.* Furthermore,

plaintiff had investigated the individual defendants' ability to make the payments and thereafter,

willingly entered into the sales contracts. *See id.* Thus, the plaintiff had "obtained precisely

what it bargained for," and that bargain did not "contemplate the individual liability of

[defendants] . . . ." *Id.* Under *Brunswick*, therefore, courts refuse to pierce a corporation's veil

where a plaintiff knew or should have known at the time it entered into a contract with a

corporation that the corporation did not have substantial assets and was being used by the

defendant for the specific purpose of avoiding the personal liability of those under the contract.

*See id.*; s*ee also Treeline Mineola, LLC v. Berg,* 801 N.Y.S.2d 407, 409 (App. Div. 2d Dep't

2005).

Where parties have contemplated and negotiated limiting personal liability on a contract,

therefore, courts are hesitant to pierce the corporate veil. *See Treeline Mineola,* 801 N.Y.S.2d at

408–09 (refusing to pierce corporate veil and hold Berg, defendant corporation's sole

shareholder, officer, and director, personally liable for unpaid rent where Berg had personally

guaranteed payment of the rent for only the first 24 months of the lease term and action was

commenced approximately eight years after lease was entered into); *Hillcrest Realty Co. v.

Gottlieb*, 618 N.Y.S.2d 394, 395 (App. Div. 2d Dep't 1994) (finding plaintiff-owner had

knowingly entered into a lease that permitted tenant to assign the lease to a related entity, at

which point tenant would remain liable to the extent of $16,000 for nonpayment of rent, and

refusing to pierce the corporate veil on this basis because plaintiff could not now assert "the lease

anticipated the unlimited individual liability of the tenant in the event of such an assignment"

and subsequent nonpayment). Likewise, "[w]here a party is aware of the risks of dealing with a

25

corporation, that party has assumed the risk of such dealings." *Favour Mind Ltd. v. Pacific Shores, Inc.*, 2004 WL 97649, at *7 (S.D.N.Y. Jan. 20, 2004).

The Defendants argue that the Owner knowingly entered into the Lease with a newly-formed, assetless limited liability company, thereby forfeiting its right to assert alter ego liability. The Defendants further contend that the Owner was never misled concerning the nature of the business relationship between the Debtor and the Defendants relating to the Premises. Specifically, the Defendants allege that the Owner knew, prior to entering into the Lease and consenting to the subsequent assignment to the Debtor that: "(1) MMC Madison & Debtor were assetless limited liability companies; (2) Debtor was to be the sole obligor on the Lease, subject to the Limited Guaranty; and (3) Miller formed Debtor for the specific purpose of avoiding personal liability under the lease." Defs. Mot. at 37. However, the evidence presented demonstrates there are disputed issues of fact relating to the Owner's knowledge and expectations.

For example, it is disputed whether prior to entering into the Lease, the Owner and Sage were aware that the Lease could only be accomplished through a "dummy corporation." In contrast to the Defendants' allegations, the Owner asserts it was not informed that the Debtor was a shell limited liability company with no employees, formed solely to be an assignee of the Lease so that Miller could avoid personal liability under the Lease. Although the evidence demonstrates that both the Owner and Sage knew the Debtor was a newly formed entity without assets or income at the time the Lease was assigned to the Debtor on July 18, 2000, it was not apparent that the Debtor would remain assetless. *See* Kaufman Dep. at 57:5; Lenchner Dep. at 56:22–23; Hr'g Tr. at 8:10–11. Indeed, testimony presented suggests that Sage thought the

Debtor possessed the ability to sell Rolls Royce and Bentley automobiles.  Kaufman Dep. 57:22–25.  This expectation is not unreasonable considering the Lease states, "Tenant shall use and occupy demised premises for automobile showroom for Rolls-Royce and Bentley motor cars and executive offices in connection therewith."  Lease at 1.  Thus, the Owner could have reasonably expected the Debtor would conduct business on the Premises, the proceeds of which the Owner could look to in the event of a default.

Specifically relating to Bentley Manhattan's activities, it is disputed whether prior to entering into the Lease, the Owner and Sage were informed that Bentley Manhattan would share occupancy and maintain offices at the Premises.  Such information directly relates to the Owner's expectations regarding the use of the Premises and contradicts the Defendants' assertion that the Owner was never misled as to the business relationship between the Debtor and the Defendants.

The personal guaranty executed by Miller and his father simultaneously with the Lease was limited to the first three years of the Lease term.  Yet, such a limitation on personal liability was not negotiated or bargained for with respect to the other Defendants.  Furthermore, it is disputed whether the parties understood that by virtue of this guaranty, no other entity would be liable for unpaid rent due beyond the first three years of the Lease.  Tr. Resp. ¶ 18; Def. Stmnt. ¶ 18.  Rather, the Owner believed that three years would be sufficient time to determine whether the enterprise would be successful or not.  Kaufman Dep. 43:24–45:9.  While this reliance may have been misplaced because the Debtor apparently had no intent to conduct any business, it is disputed whether the Owner knew this.  Tr. Resp. ¶ 21; Def. Stmnt. ¶ 21.  The Defendants also present facts that suggest the Owner knew other entities were using the Premises.  For example,

Miller sent Sage, the Owner's agent, the certificate of liability insurance, stating the insured were "Bentley Manhattan Inc." and "Madison Bentley Associates LLC."  Insurance Letter, attached as Exh. I to Miller Aff. (ECF No. 26-9); Hr'g Tr. at 44:14–21.  Additionally, there were several prominently displayed signs for "Bentley Manhattan" at the Premises and the majority of the monthly rent checks came from "Bentley Manhattan."  It is unclear, however, how such purported knowledge during the term of the Lease is relevant to the *Brunswick* defense, which looks to the Owner's knowledge at the time of contract formation.  *See Brunswick*, 599 F.2d at 36.

These factual disputes have a direct bearing on the Owner's knowledge when entering into the Lease and agreeing to the subsequent Lease assignment to the Debtor.  Given these disputes, it is not clear that the Owner knew the Debtor was a "dummy corporation" that would leave the Owner without recourse upon a default after three years.  Thus, there are material facts in dispute that preclude the grant of summary judgment to either party as to the *Brunswick* defense, and therefore, as to the alter ego claim asserted in Count I.  *See Celotex Corp.*, 477 U.S. at 322; *Anderson*, 477 U.S. at 255 (on a motion for summary judgment, the facts must be viewed in the light most favorable to the non-moving party).

## III.    Plaintiff's Claim Regarding Assignment of the Lease Fails

As an alternative to its alter ego claim, the Trustee also argues that a party accepting an assignment of a lease assumes the tenant's obligations thereunder and becomes liable to the lessor for all the rental obligations.  Tr. Mot. at 18; Plaintiff's Reply Memorandum of Law ("Tr. Reply") at 12 (ECF No. 53) (citing 1 Dolan, Rasch's Landlord & Tenant, Sections 9:24, 9:33–34; *Barr v. Country Motor Car Group, Inc.*, 732 N.Y.S.2d 619, 620 (App. Div. 4th Dep't 2001)).

28

The Defendants disagree, claiming that they are not liable as either assignees or subtenants of the Debtor, because a non-party cannot be bound by the contractual provisions of a lease. Defs. Opp. at 26 (citing *HDR Inc. v. Int'l Aircraft Parts, Inc.,* 257 A.D.2d 603, 604 (2d Dep't 1999)). But nowhere in the Complaint does the Plaintiff ever mention the assumption of lease obligations, thereby barring the Plaintiff from seeking summary judgment on this claim. *See* Compl.; *see also Hickey v. State Univ. of N.Y. at Stony Brook Hosp.*, 2012 U.S. Dist. LEXIS 105182, at *15–16 (E.D.N.Y. July 27, 2012) (noting that a party cannot seek summary judgment for himself on a new claim that has not been pled in his complaint); *Coram Healthcare Corp. v. Cigna*, 2002 WL 32910044, at *11 (S.D.N.Y. July 24, 2002) (finding plaintiff not entitled to summary judgment where claims raised in moving papers were not alleged in the complaint).

In any event, such a cause of action would be futile. Any claim against the Defendants based on a purported assignment would be a breach of contract claim with a six year statute of limitations. *See 833 Northern Corp. v. Tashlik & Assocs.*, 248 A.D.2d 664, 665 (App Div. 2d Dep't 1998) ("The Statute of Limitations for an action upon a lease obligation is six years."); N.Y. C.P.L.R. § 213 (contract action must be commenced within six years); *see also Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) ("Leave to amend may properly be denied if the amendment would be futile . . . ."). As such, it would suffer from the same statute of limitations defect that resulted in dismissal of the Trustee's claim in Count III under Section 544(b)(1). *See In re Madison Bentley*, 516 B.R. at 731–32.

## IV.    The Fraudulent Conveyance Claim in Count II

The Court turns finally to the Trustee's remaining claim under Section 544(b)(1). That section permits the trustee to "avoid any transfer of an interest of the debtor in property or any

obligation incurred by the debtor that is voidable under applicable law by a creditor holding an

unsecured claim that is allowable under Section 502 of this title or that is not allowable only

under section 502(e) of this title." 11 U.S.C. § 544(b)(1).  A trustee may avoid any transfer that

could have been avoided by an unsecured creditor under the New York Debtor and Creditor Law

("NYDCL"), which sets forth different types of fraudulent conveyances.  *In re Furs by Albert &*

*Marc Kaufman, Inc.*, 2006 Bankr. LEXIS 3614, at *25 (Bankr. S.D.N.Y. Dec. 14, 2006).

NYDCL defines a conveyance as "every payment of money, assignment, release,

transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any

lien or incumbrance."  N.Y. Debt. & Cred. Law § 270.  The Trustee relies on NYDCL Sections

273 through 275 for the second claim for relief (the "Constructive Fraud Claim"):

> § 273.  Conveyances by insolvent.  Every conveyance made and
> every obligation incurred by a person who is or will be thereby
> rendered insolvent is fraudulent as to creditors without regard to his
> actual intent if the conveyance is made or the obligation is incurred
> without a fair consideration.

> § 274.  Conveyances by persons in business.  Every conveyance
> made without fair consideration when the person making it is
> engaged or is about to engage in a business transaction for which the
> property remaining in his hands after the conveyance is an
> unreasonably small capital, is fraudulent as to creditors and as to
> other persons who become creditors during the continuance of such
> business or transaction without regard to his actual intent.

> § 275.  Conveyances by a person about to incur debts.  Every
> conveyance made and every obligation incurred without fair
> consideration when the person making the conveyance or entering
> into the obligation intends or believes that he will incur debts
> beyond his ability to pay as they mature, is fraudulent as to both
> present and future creditors.

Under NYDCL, therefore, a "conveyance by a debtor is deemed constructively fraudulent

if it is made without 'fair consideration'" and either: "(1) the transferor is insolvent or will be

30

rendered insolvent by the transfer in question (DCL Section 273); (2) the transferor is engaged or

is about to engage in a business or transaction for which its remaining property constitutes

unreasonably small capital (DCL Section 274); or (3) the transferor believes that it will incur

debt beyond its ability to pay (DCL Section 275)." *In re Allou Distribs., Inc.*, 387 B.R. 365, 403

(Bankr. E.D.N.Y. 2008).

   The Trustee complains that the Debtor allowed the Defendants to use the Premises during

the Lease to sell cars and related items without compensating the Debtor.  The Trustee

characterizes the alleged conveyance in several different ways throughout the pleadings.[7]  But

regardless of how the Trustee characterizes the conveyance, it is essentially a transfer of the

property interest in the Lease from the Debtor to the Defendants.  The transfer was "continual or

ongoing" during the term of the Lease.  *In re Madison Bentley*, 516 B.R. at 730 (finding transfer

from the Debtor to the Defendants occurred continuously "each and every day that the

defendants . . . used the premises"); *see also* H'rg Tr. at 35:16–18 ("operative event of course

was the use of the [Premises] by these other entities, and that was an ongoing thing."); *id*. at

35:19–23.  Indeed, it is undisputed that Bentley Manhattan used the Premises during the Lease

term to conduct business operations.  The transfer was ongoing through the end of the Debtor's

occupancy on September 29, 2003.

   Based on the undisputed facts, this transfer was a transfer of an interest that is voidable

under Section 544(b)(1).  The grant of a license to use real property constitutes a conveyance for

---

[7]     At times the Trustee contends that the Defendants were assignees or subtenants, while other times the
Trustee simply refers to a transfer of the Debtor's leasehold rights.  While subleases and assignments have some
distinct legal aspects, they both convey a present interest in the property.  *See, e.g., Avalon LLC v. Coronet Props.
Co.*, 762 N.Y.S.2d 48, 49 (App. Div. 1st Dep't 2003) (assignment conveys present interest); *see generally New
Amsterdam Casualty Co. v. Nat'l Union Fire Ins. Co.*, 266 N.Y. 254, 259–60 (1935) (distinction between
assignment and subtenancy is reversionary interest).

purposes of NYDCL. *See In re Madison Bentley*, 516 B.R. at 731–32 (citing *348-352 W. 27th St. Corp. v. Dropkin*, 36 N.Y.S.2d 740, 743 (Sup. Ct. N.Y. Cnty. 1942)). A license in real property authorizes the licensee "to enter upon the lands of another to do a particular act or series of acts without possessing any interest in the lands." *In re Yachthaven Restaurant, Inc.*, 103 B.R. 68, 72 (Bankr. E.D.N.Y. 1989) (citing 3 Warren's Weed on the New York Law of Real Property, *License* § 102 (1989)). It is undisputed that the Debtor never conducted any business on the Premises. Rather, Bentley Manhattan occupied the Premises by displaying automobiles and maintaining offices, from which it sold boutique accessories, at the Premises. Tr. Stmnt. ¶¶ 12, 32, 42; Def. Resp. ¶¶ 12, 32, 42. Similarly, Manhattan Motorcars owned the automobiles which it displayed at the Premises. Thus, the Debtor permitted each of these entities to use the Premises, which constitutes a conveyance.

Furthermore, the conveyance occurred absent "fair consideration," as the Debtor received no consideration for permitting either of these entities to use the Premises. *See* N.Y. Debt. & Cred. Law § 272. Indeed, throughout their use of the Premises, neither Bentley Manhattan nor Manhattan Motorcars compensated the Debtor. Miller Dep. at 18:17–20 ("I can just tell you that [the Debtor] didn't receive any rent. There was monies advanced to this company so they could pay rent. That was the only monies [the Debtor] ever had.").

The Debtor's conveyance to the Defendants also satisfies the elements of NYDCL § 273. The Debtor conveyed to the Defendants a license to use the Premises, without consideration, and was thereby rendered insolvent. *See In re Flutie New York Corp.*, 310 B.R. 31, 52 (Bankr. S.D.N.Y. 2004). The elements of NYDCL §§ 274 and 275 are likewise met. Upon conveying the Lease to the Defendants for no consideration, the Debtor was left with "unreasonably small

32

capital," indeed, no capital, thereby satisfying NYDCL § 274.  *See id.* at 54.  Finally, having

conveyed the Lease to the Defendants for no consideration, the Debtor was left unable to pay

liabilities or debts as they became due, and thus, NYDCL § 275 has been satisfied.  *Id.* at 55; *In*

*re Allou Distribs.*, 387 B.R. at 403.

       The Defendants make several arguments on Count II but none have merit.  First, the

Defendants contend the Trustee is precluded from asserting claims under NYDCL Sections 274

and 275 because such claims were not included in the Complaint.  Defs. Opp. at 38.  While the

Trustee did not explicitly state that it was asserting claims under NYDCL 274 or 275, the

complaint contained sufficient facts to put the Defendants on notice that it was seeking recovery

under those sections.  Compl. ¶¶ 19–20, 27 ("Debtor never had any assets or income from

operations . . . . Debtor provided Premises for no consideration to Defendant Bentley Manhattan .

. . . The Debtor transferred its sole valuable asset, the right under the Lease to operate a car

dealership at the Premises, to the Defendants without fair consideration when the Debtor was, or

was thereby rendered insolvent."); *see In re Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 317,

332–33 (Bankr. S.D.N.Y. 2011) (recognizing constructive fraud claims under the Bankruptcy

Code and NYDCL do not need to meet heightened pleading requirements but rather, must only

give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests" such

that the defendant can "prepare an answer, frame discovery and defend against the charges")

(citations omitted).  Second, the Defendants argue no conveyance had taken place.  But this

argument is inconsistent with the District Court's conclusion that the arrangement between the

Debtor and the Defendants was "one in which the [D]ebtor effectively transferred its right under

the lease to operate a . . . showroom to the [D]efendants[;]" thus constituting a conveyance.  *In re*

33

*Madison Bentley*, 516 B.R. at 730.  Finally, while the Defendants dispute that a conveyance had

in fact occurred, in the alternative, they argue that Plaintiff's fraudulent conveyance claim in

Count II is time-barred.  However, as stated above, the District Court found that the conveyance

was "continual or ongoing," and therefore, not time-barred to the extent it occurred after

September 11, 2003.  *See id.* at 729–31.

       Accordingly, the Trustee is entitled to a turnover of proceeds for the 19 days from the

statute of limitations cut-off on September 11, 2003 until the termination of the Lease on

September 30, 2003.  *Id.* at 731 (concluding constructive fraudulent conveyance claim not barred

to extent accrued after September 11, 2003).  But notwithstanding the Court's conclusion as to

liability, there remain issues as to the measure of damages.  For one thing, neither party has

submitted any damages calculation, much less evidence, for this 19 day period.  Moreover, there

is a dispute about interest that precludes a determination on damages.  The Trustee seeks post-

petition interest under Section 726(a)(5) of the Bankruptcy Code, arguing that the claims asserted

against the Debtor are not dischargeable against the Defendants, the Defendants are solvent, and

the application of the Defendants' assets to payment of the claims of the Debtor renders the

Debtor's estate solvent.  *See* Tr. Mot. at 23.  The Trustee provides no further information or

detail as to how Section 726(a)(5) applies in the present instance. The Defendants disagree,

arguing the exception in Section 726(a)(5) applies when the debtor is solvent at the time it filed

its bankruptcy petition, and that the Debtor was insolvent when it filed its petition.  *See* Defs.

Opp. at 37.  Neither party tackles the issue of the Debtor's solvency.  In fact, the issue of the

Debtor's solvency was not addressed in either parties' Statements of Undisputed Facts.  At this

time, therefore, the Court lacks sufficient information to make a determination on this issue.[8]

## **CONCLUSION**

For the reasons stated above, the Court denies the parties' cross motions for summary

judgment on Count I.  As for Court II, the Court directs the parties to submit within 10 days a

joint proposed schedule for the submission of additional briefing and evidence on the damages

questions identified above.  In the meantime, the Plaintiff should settle an order on these motions

consistent with this Decision on three days' notice.  The proposed order must be submitted by

filing a notice of the proposed order on the Case Management/ Electronic Case Filing docket,

---

[8]     Given the District Court's decision, the Trustee is not entitled to attorney's fees arising out of a successful claim under NYDCL Section 276-a, because the Trustee's claim under Section 276 for actual fraud is time-barred. *In re Madison Bentley*, 516 B.R. at 731–32.

with a copy of the proposed order attached as an exhibit to the notice.  A copy of the notice and

proposed order shall also be served upon counsel for the Defendants.[9]


Dated: New York, New York
      **October 16, 2015**


                    **/s/ Sean H. Lane**
                    UNITED STATES BANKRUPTCY JUDGE

---

[9]      In adjudicating these motions for summary judgment, the Court is mindful of the scope of its constitutional authority under *Stern v. Marshall*, 131 S. Ct. 2594, 2609 (2011).  In *Stern*, the Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim."  *Id.* at 2620.  In adversary proceedings, orders granting summary judgment as to some or not all claims are generally regarded as interlocutory.  *See In re Chateaugay Corp.*, 922 F.2d 86, 90 (2d Cir. 1990); *cf. Kushner v. Winterthur Swiss Ins. Co.*, 620 F.2d 404, 408 (3d Cir. 1980) (holding that in the absence of certification under Rule 54(b), an order granting a motion to dismiss with prejudice as to some defendants in a multi-party action was not a final order).  In an adversary proceeding such as this one, the order ending the adversary proceeding would generally be the only final order.  *In re Trinsum Grp.*, 467 B.R. 734, 741 (Bankr. S.D.N.Y. 2012).  This Court's decision today is interlocutory as it addresses only liability on Count II but leaves open the question of damages, and denies outright summary judgment for both parties on Count I.  The Court is mindful, however, that the damage calculation on Count II appears to be the only matter left that would be appropriate for this Court to address.  The District Court is constitutionally charged with entering any final judgment in this case, which here appears to require a trial on the merits of Count I.  *See In re Madison Bentley*, 474 B.R. at 433–39.  As all discovery in this matter has been completed, the parties should consider whether it is appropriate in the near future to seek to withdraw the reference in this case to the District Court so that this matter can proceed to a final judgment.